Good morning, Mr. Andrews. Yes, Judge Thompson, Judge Kayada. May it please the court. My name is Robin Andrews and I represent Juan Gonzalez-Arias, the appellant in this matter. At the heart of our adversarial criminal justice system is the Sixth Amendment right to counsel. For those without, that means that they rely on the effective assistance of whatever counsel they are provided. After January 9, 2017, Mr. Gonzalez-Arias found himself somewhere between the contours of this right. He felt strongly that his counsel whom he had retained had not provided him effective assistance of counsel, and he was not in a position to choose whose order would be in the future. How many lawyers did he have altogether? So, if you include, one of them was Prohoc Bice, so I think that there were six altogether. I think actually there were seven altogether. It's hard for me to really count Mr. Watkins as counsel because he was involved for such a short period of time. And it's also difficult for me to count the first two lawyers because their involvement was pre-trial without much involvement in actual court proceedings. What is critical, though, is that these lawyers all had an obligation to inform Mr. Gonzalez-Arias about the evidence that the government wanted to present against him. And that is really the heart of what his claim is. The heart is that he had all of these lawyers, some he paid substantial sums of money for, and not one of them had provided him with the key evidence in his case. The premise, it appears pretty clear that one of these many lawyers that he burned through, one of them dropped the ball on doing something that he told the judge would do, which is to give your client a check of the evidence. And so his argument is that that somehow caused him to plead guilty when he might otherwise not. The unstated premise there is that if he'd seen that evidence, he would have said, aha, they've got a weaker case against me than I thought. Isn't your problem on the review here is that that evidence is highly inculcatory? I mean, they have him dead to rights. How is that going to cause him not to plead guilty? So what he said during the sentencing proceeding was, had I seen the evidence, or after I saw the evidence, I decided that my Fourth Amendment rights were violated. And while that proceeding had occurred in that there was a motion to suppress, and the issue in that case, whether there was sufficient nexus between the house and the criminal acts, is something that's in dispute. And I think that was the beginning of this descent into the problems that Mr. Gonzales-Iris was having with his lawyers. If we disagree, I still don't understand the argument. If we disagree and find that there was sufficient nexus, I mean, the evidence is what the evidence is. I don't see how him having seen it, you haven't pointed to anything that would have caused him to say no. Assuming the court agrees with the government, I'm prejudiced by not having seen this beforehand. Well, the way that I've come to view this, if we look at what Missouri v. Fry said about the regulation of the plea negotiation process, the opportunity for the court to make sure that that process is functioning appropriately with respect to the rights of the accused is to remedy that during the Rule 11 call agreement, which he did here. The district court ordered Mr. Gleason to provide the discovery. He didn't say if he could sometime. He said, before you appear in court on Monday, I want you to have provided, and he essentially gives a list of the things that he had. The effect that had was that it essentially robbed Mr. Gonzalez-Arias of the opportunity to make a choice. The choice was either I can accept the benefits that I'm being told, although I'm not sure I understand them, I get from this plea agreement, or I can go to trial, which, to your point, Judge Cayeta, the evidence was very strong against him. That was not a decision that could be made on the fly. It needed time. It needed the understanding of what precise evidence there was. And if we were to think about the proceedings as a whole, even if the motion to suppress the argument occurred, it was unlikely that Mr. Gonzalez-Arias could really appreciate what was being said about the contacts that he had from his home with the conspiracy that he was engaged in. And that is significant, because while he may have understood that there was some legal process, he didn't understand that from conversations with his lawyer. He didn't understand the factual basis for any of those claims, because the lawyer had never presented him with the evidence. Again, though, your premise is that had he had adequate counsel at that point, and he said to the counsel, what about this search, this nexus search? The premise is that a competent counsel would have told him, oh, we've got some shot at getting that suppressed. And yet, when we look at it, I don't even see a lack of nexus, but certainly, how would you ever get over the loan in this situation in order to get it suppressed? So in a more recent case that a petition with the Supreme Court for writ of certiorari has been filed, the Sixth Circuit in United States v. Christensen, which I just came across this case yesterday, and I'll provide a 28-J letter to the court, it's precisely the same situation. A long-term drug dealer who had some contacts with his home and whom a district court judge decided that those were insufficient nexus. And that case was ratified by the Sixth Circuit. And while it's in some dispute because they've agreed to accept that and bank, I think that had that existed at the time, it would have made quite clear. And from Mr. Gonzalez, Arias' perspective, he was concerned that this motion didn't really address what is apparently a significant circuit split, let alone a split between other states' highest courts. So the issue of the nexus is just the first problem, where it appears, right? But there's a more serious problem, right? And that's when he's trying to understand why he must plead guilty and what benefits he gets. He doesn't have the evidence or the understanding of how that evidence is going to be applied to him to make any real decision. So what he does is he tries to protect himself. He can't do it with the help of his counsel who has dropped the ball. When the judge asked, did you bring that stuff? His lawyer's response was, well, I got back to my office late and then I couldn't get it together. And so I didn't have it together when I went to go meet with him. And I didn't provide it to him. Well, that wasn't the first time that he had to go to the court and explain to the court that he wasn't prepared because of some problem getting ready for a court date. And it wouldn't be the first time or the last time that he had to explain when he, in fact, didn't show up for the hearing on the motion to withdraw. Excuse me, did you have to show prejudice by your client because he didn't receive that information? Well, if we look at Frye, I think Frye says, this is the kind of situation. Can you just help me by telling me yes or no? Yes, he was prejudiced. No, no. Is that part of your case? You have to show prejudice. Yes, Your Honor. It is part of my case. So if you have to show prejudice and he would not have been helped in any way by seeing this information, why do you have a case? I believe that I have a case because this is the Hill situation as applied to plea bargaining process. Plea bargaining process is the decision itself, not the result of the decision. He needed to have the information and the assistance of counsel to make the decision. He couldn't make the decision without having had the discovery. And it isn't a situation where he just didn't have access to the discovery. He didn't understand the discovery. And that is something that his lawyer needed to do and simply didn't. Well, he didn't have the videos, but didn't he have written transcripts of what was contained on the videos? I thought that's what the record said. I think that the record says that he didn't have line sheets and he didn't have the audio and video. And I think that the judge said, I want you to bring the line sheets and I want you to bring the audio and video so that he can see it. And he didn't. And that is really the heart of this problem because that would have given him the understanding of those issues. How strong is the case against me? And is it better for me to accept the benefits of or I believe that I can get something in addition by having a trial. And that I think is really what this comes down to is that he didn't have the ability to make that decision without the evidence. And by that time, his relationship with Mr. Gleason was such that he couldn't trust his Even though he got additional lawyers, we still have problems when it came to sentencing. He still hadn't objected to the pre-sentence report and he didn't file a sentencing memorandum, all of which things sort of hurt him as he continued on through the process. I have three minutes for rebuttal. My remaining arguments, I'll rely on my brief. Thank you. Thank you. Ms. Young, good morning. Good morning, Judge Torreo. May it please the court, Cynthia Young for the United States. So let me start with one thing, which is the facts. I think there's a bit of a moving target for Mr. Gonzales-Zarayas here as to what he did see and what he didn't see. There's no evidence in the record that he didn't see the line sheets. In fact, part of the problem is Mr. Gonzales-Zarayas changes what he saw from moment to moment, depending on who questions him. So originally at the January 5th, the first plea hearing in 2017, he suggested he didn't see anything. And then it's clear that he saw all the documentary evidence. That means that what he saw was all of the government's automatic discovery, which includes the line sheets, which the government's lawyer later said in a subsequent hearing had been turned over to him. And his own lawyer said, yes, he had seen that. But what he hadn't seen was the audio video. It turns out that the photos were at Wyatt where he was being held, but they were being held for processing. They had to have been turned over. That's pursuant to the local rules of the district court. And then there's more questions about what of those he saw. So he saw the photos, but what he didn't actually hear was the tapes. And he didn't see the poll camera. At least that's what he said. What's clear is most of that was at Wyatt. What we don't know is whether he saw it or he didn't. Because I would also note that by the time of the sentencing, when, as my defense counsel knows, he then said he would have filed a Fourth Amendment claim, which he did. The other thing he says is, if only he had had the search warrant affidavit. But he clearly did have the search warrant affidavit. That was turned over to him early. So part of the problem is that he changes what it is he saw and what he didn't see. So that's the first issue. I do think that the government had turned all of this over. A lot of the problems were exacerbated by the fact that he did keep changing lawyers. And while I agree that Mr. Fick, who was originally appointed, but that was on the complaint, and then he was replaced by a retained counsel, and then he was replaced by another retained counsel, maybe all of them can't be assigned to Mr. Gonzalez-Sorais as him getting rid of lawyers. But the fact is, he did have most of this material. He did know what he was getting into. And on January 5th, and this is at the actual appendix, page 53, Mr. Gleason says his core concern is the amount of drugs. It's not whether he's guilty. He doesn't say that. But he does say his core concern is the amount of drugs. And at that point on January 5th, there's no indication that the concern is anything other than defendant wanted one to three kilos that should be assigned to him, his responsibility. That would give him a base offense level of 30. And the government thought it was more than three kilos, which would have made him a base offense level of 32. That was what everyone was fighting over. And the government at the end of that January 5th hearing where the defendant did not plead guilty in the end, the government made the point of saying, you know, just be forewarned, if you do proceed to trial or don't plead guilty soon, we have the option of an 851 because he has a prior drug conviction. There's also the gun that was found in his home. It was a loaded handgun. So there were other things that the government could have charged him with and he should just be aware of those factors. It's only four days later at the actual plea hearing, for the first time, the defendant says, oh, and by the way, my, I think it's John Verichea, that he told me that I was only responsible for 850 grams, not even one kilo. But that's not what he had said on January 5th, when he was willing to plead to one to three kilos. So at that point, the defense lawyer shows him, and this is in the record, shows him in court the drug certifications that show that this is simply not true. There was 1.2 kilograms of, I can't remember whether it's heroin or cocaine, I'm sorry, that was a lot of sort of moving targets here as to what was really going on. I would also add that as we cite in our brief, the 8th, the 7th, and the 4th circuits have all said expressly that there's no constitutional right for the defendant personally to view all the discovery. But the defendant in this case knew what the discovery was because he'd seen all the documentation that the government had turned over, and I would add, this is not a This was intercepts of him on his cell phone, mostly in his apartment. And so the claim that he somehow didn't have any knowledge with which to actually decide to plead guilty is, in the government's view, absurd, because he did have the knowledge, and he had most of the discovery. If the court has, oh, and one other thing is that, so two other things, sorry. The defendant also claims that somehow this would have changed his decision. Again, there's no way this would have changed his decision. The argument here was about how much, and the government said it was 3.9 or 4.2 kilograms. He said it was less than 3. Finally, under Hill v. Lockhart, the ineffective assistance of counsel standard, the real issue, Judge Strayer, as you first raised, was prejudice, which is, under that standard with a guilty plea, was there a reasonable probability, even assuming the lawyer did something wrong here, which I reject. I do not think his performance was anything other than terrific. He did both the suppression motion and the guilty plea. But on the prejudice prong, reasonable probability that, but for counsel's errors, he would not have pleaded guilty but would have gone to trial. I do not think there can possibly be such a showing, given the evidence against him and the potential for a much higher sentence. The defendant was completely involved in his defense, as you can see from reading the transcripts, not on January 5th, because he does not speak then, but he does send the court letters. He does read a letter on January 9th, and he's participating even before the sentencing. He's always a participant in these hearings. It turns out that he does understand the questions, he does speak English, and he is, as the judge says, a better lawyer than some others. So I don't think there's any question that there was effective assistance of counsel provided by Mr. Gleeson, and if the court has any other questions. Well, Mr. Gleeson, Mr. Gleeson wasn't his attorney at that point. I mean, what issue on the record is that at the point that the plea was entered, Mr. Gonzalez was requested to make a three-part decision? Mr. Gleeson was his lawyer at the time. Was it a standby counsel? No. So Mr. Gleeson was appointed, I don't remember exactly when, but he was the, so first you had Mr. Fick, then you had Stephen DiLiberio, then you had John Verituria, who was actually in it for a while until they had irreconcilable differences. He left, then Mr. Gleeson came in. Mr. Gleeson was the attorney from throughout the motion to suppress, he's the one who wrote the motion to suppress. He did the suppression hearing, and then he was the lawyer for the guilty plea. That was January 5th was the status, and then January 9th was the actual guilty plea. Mr. Gleeson was not, they didn't have a breakdown in their relationship until March 24th when the motion for withdrawal was filed. So it was actually almost two and a half months after the guilty plea that Mr. Gleeson was out. And then on March 29th, there's a hearing at which the court decides that Mr. Gleeson should be excused, that they do at that point have irreconcilable differences. But even then, it doesn't get in, at no point was there a mention about withdrawal of the plea. That's March 29th. The Federal Defender's Office is brought in. There is a change of personnel in the Federal Defender's Office. We don't consider that to be different lawyers. That's just the same representation. But the first mention... And it was at his sentencing that he objected to the Federal Public Defender proceeding as his counsel? It was before that. So in, I'm trying to remember, October 9th is when he files the motion to withdraw his plea. And then it's after that, when the court denies it, the next day, so I think that's November 6th, is the court denies the motion to withdraw the plea, the guilty plea. And on that, he files another request, and the court denies both of those requests. And at that second hearing is when the court decides that the Assistant Federal Defenders, Public Defenders, will be stand-by counsel. Didn't one of the lawyers, one of his lawyers, fail to do specifically what the trial judge told him to do in explaining he was tied up with other stuff? Yes. Do you call that terrific? No, I, well, that piece is not terrific, but you have to look at the totality of the effective assistance of counsel. And that was not, he did not... Well, now you're on prejudice. Pardon? Now you're on prejudice. Yes. In terms of performance, but again, you can't, if you, if you are picking apart performance as one little piece at a time, that would make almost all of us ineffective at some point for failing to do one tiny thing. Yes, he did not, he was, that's more a violation of the court's order than anything else. As I said, there was a moving target as to what he'd actually seen, and what he actually already had. There's no doubt that the lawyer should have taken that material to the defendant at Wyatt that weekend. That was what he was ordered to do. He violated the court order by doing it. But ultimately, you then slip into the prejudice prong, and that's where we have the problem that he did have most of that information. And ultimately, would any of that, the, and even he admitted he had the documents, so would any of the audio video material have made a difference? And the answer is, was there a reasonable probability it would have gone to trial? I think the evidence is clear from the record, no. Even just if you look at the affidavit for the search warrant, there's plenty of evidence as to him dealing drugs out of that apartment, and how much it was even before the search was executed. I'm still trying to focus on the date when, the hearing where he was appointed stand by counsel. I mean, there's really nothing in the record where he affirmatively agrees, after being advised of all of the perils of pleading, of representing himself, where he affirmatively agrees to represent himself, or where he waived his right to counsel. Well, the judge, what the judge said, that was the hearing on December 13th. So at that hearing, the district court said to the defendant, you have three choices. Choice one, keep your lawyer. Choice two, go pro se, fire your lawyer. Choice three, go pro se, but I'll give you these lawyers as your stand by counsel, resistant federal public defenders. And the defendant's answer was, I choose option four, which is you find me a new lawyer and appoint a new lawyer. The judge says, no, this is gangsmanship is what's going on here. You waited until a week before sentencing, and now you're doing this again. And you have to make a choice. And in the end, what the defendant says is fine. Now, we don't obviously know the tone of voice of that client, but he does say fine, that he will go forward with assistant federal public defenders as his stand by counsel, and he will represent himself. Also, I would note that at that hearing, the court said that this had been going on for a while, but the stage they were at right before sentencing, there were only two issues left for the defendant and his lawyer to deal with. That was the proper calculation of the guidelines, and the second was what sentence should he get. He was facing a because he had pleaded guilty, and he had agreed to the statement of facts of the guilty plea, that it was one to three kilograms, and that's what his plea agreement said. And in fact, if you look at the plea agreement in the government supplemental appendix, you'll see that the government had crossed out what had been in there before. At the last minute, they had changed, and the government had come down to his numbers of one to three kilograms. If we were to determine that there was not an effective waiver of counsel, what would his remedy be? Would we remand it for sentencing? I think that would be the only remedy at this point. Everything else should stay in place because it would just be the sentencing. But I just don't see that his waiver, if you look at this court's prior cases, particularly Carr, Mejia, and Carnation, Woodard, Neelan, the court has repeatedly said that when a defendant is given an option, you either go pro se, or you just live with the lawyer you've got. Given the timing of some of these, that that is a voluntary relinquishment of his right to counsel, and he has agreed to go pro se. The judge here, while it was not the most complete explanation of what problems he faced, he did tell him, among other things, that there were a lot of rules. They were very difficult. It was very complicated. If he represented himself, he had a full court client, a number of things like that. So I think by this court's precedent, that this was squarely within what this court has found to be a proper waiver of the right to counsel, and then to proceed pro se. So, I'm going to go back. Thank you. Thank you. With respect to when Mr. Gleason began participating in proceedings, the first indication that I have that he filed something, I don't have an actual entry of appearance on the docket, but I do have a motion to suppress that he filed on June 24th, 2016. And I think that that's when he began pursuing the things that Mr. Gonzalez Arias, I'm sorry, Mr. Gonzalez Arias wanted pursued. I think that when he went through the motion to suppress, that he understood that the court might take a different view of that particular issue. And while we've preserved it here, I'm not sure that Mr. Gleason's assistance was ineffective at that point. But I am certain that his assistance fell below a measurable standard of an objective, reasonable attorney. I think that those things are key in that the prejudice here is to his decision, not to the resolve, but to his decision, which required him to make a decision that he was going to make. He made a decision about what was better for him on a deadline. And Fry gave the court the ability and the authority to regulate that. And the court didn't. The court became skeptical of Mr. Gonzalez Arias, although it is not clear on the record why he became skeptical. Every time that he would say, you've had so many attorneys, Mr. Gonzalez Arias would try to explain that some of those lawyers didn't work out. Perhaps it was money. Perhaps it was because they didn't get along. But it wasn't until Mr. Gleason that he affirmatively took steps and that he was engaged in his defense in a very personal way, because he no longer trusted the people that were representing him. The government has a very different representation of what was provided to your client. Now, what they provided through counsel and what counsel sent to Mr. Gonzalez Arias might be two different things. But if we call them through the record and find that based upon disclosures in the courtroom that a lot of stuff was provided to him, I'm still having difficulty with the prejudice piece. So I want to say that on March 27th, he says that discovery came through Wyatt on January 27th. He says that. So it's reasonable to assume that he had the discovery after the 27th, but not before he was making the plea. And without that, he had no real basis on which to understand how strong the evidence was. And it was clear from the conversations that he was having with Mr. Gleason on the record that he didn't understand how significant the evidence was. So you're saying that he got no discovery before entry of the plea? Seems to be the case. I mean, he was at the probable cause hearing, which is the only reference on the record to him understanding some of the facts. I assume that he was at the motion to suppress, but that was just the oral argument. There was no evidentiary hearing. And because of that, I don't think that he had any real access to the evidence. I mean, he understood what his lawyer was saying, right? But he had never looked at the evidence himself. If that helps, Your Honor. We'll certainly check the record. Thank you. Thank you. Ms. Young, I understand that I heard from a little bird that you're retiring. I am, Your Honor. Well, congratulations and best of luck. Thank you very much, Your Honor.